MELINDA HAAG (CABN 132612)
United States Attorney

J. DOUGLAS WILSON (DCBN 412811)
Chief, Criminal Division

THOMAS A. COLTHURST (CABN 99493)
Assistant United States Attorney

  150 South Almaden Boulevard, Suite 900
  San Jose, California 95113
  Telephone: (408) 535-5061
  Facsimile: (408) 535-5066
  Email:    tom.colthurst@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) No. 12-CR-00583 EJD |
| Plaintiff, | ) GOVERNMENT'S SENTENCING MEMORANDUM REGARDING DEFENDANT JONATHAN HOANG |
| v. | ) |
| JONATHAN HOANG, | ) Date: July 2, 2014<br>) Time: 9:00 a.m.<br>) Court: Hon. Edward J. Davila |
| Defendant. | ) |

## I. INTRODUCTION

In accordance with Section 6A1.2 of the Sentencing Guidelines and this Court's local rules regarding guideline sentencing, the United States of America, by and through Assistant United States Attorney Thomas A. Colthurst, hereby represents that it has reviewed the Probation Office's presentence report ("PSR") in this matter, and that the government does not dispute any factor or fact contained therein.

The government concurs with Probation's recommendation of a prison sentence of 84 months which is in the middle of the range computed in the Presentence Report ("PSR"). The factors listed in 18 U.S.C. § 3553(a) support this result. Jonathan Hoang was a predator. He literally lived off of the people he defrauded. His victims thought they were purchasing stock. The stock did not exist.

In many cases, Hoang lulled the victims into believing their investments were safe by claiming that he was a DEA agent. He also used the pretense of DEA employment as a means of deflecting inquiries by investors. Hoang used investor funds to pay for his lifestyle, which included nice houses and cars, with no actual employment. He is 48 years old, and he has not had an actual job since at least 2000 [PSR ¶ 104.] The various frauds are how he has lived.

Since fraud was his livelihood, he continued to prey on friends and associates even after he was arrested on the DEA agent impersonation charges in July 2012. Just before he was arrested again in November 2012, he managed to defraud at least one more investor. This investor's check and stock purchase agreement were found in Hoang's Mercedes S500 after Hoang was arrested.

It is both startling and instructive that Hoang managed to continue to separate friends and acquaintances from their money even after media coverage of Hoang's arrest in July 2012. The only thing -- repeat, the only thing -- that stopped Hoang was his incarceration after his bond violations were uncovered. He must remain incarcerated for a substantial period of time to protect society and to vindicate society's interests in a just sentence and in deterrence.

## II.     OVERVIEW OF THE INVESTIGATION AND HOANG'S CRIMINAL CONDUCT

This case started when Hoang was detained by San Jose Police officers shortly after midnight on July 20, 2012. They found him in his truck which was equipped with emergency lights and a siren, similar to law enforcement equipment. Inside the truck, the officers found purported DEA badges and other insignia. Hoang consented to searches of the truck and a house containing Hoang's possessions, and additional DEA accessories were found. Still more DEA paraphernalia and other evidence that he was impersonating an agent were found when DEA and FBI agents executed search warrants at other locations where Hoang had stored his possessions. Hoang also gave a statement in which he admitted that he had been posing as a DEA agent. DEA also discovered that Hoang used his purported status as a DEA agent to avoid credit checks when he was renting houses.

On July 25, 2012, Hoang was indicted by a federal grand jury and charged with several offenses based on the impersonation scheme. Meanwhile, DEA, the FBI and IRS obtained statements and documents indicating Hoang's involvement in defrauding investors. The agents learned that Hoang has been offering investment opportunities since at least 2001. In many instances, Hoang used his claimed employment with the DEA to assure investors of the legitimacy and safety of his proposals. Hoang told

several investors they were buying stock in a company that was about to be acquired and that the stock's value would significantly increase after the acquisition. Several investors thought they were investing in stock of companies called Generation Pix, Inc. ("GPix") and Utherverse Digital. The FBI has contacted these companies and confirmed that they were not distributing their stock through Hoang and these companies were not being acquired by other companies.[1] Ultimately, the agents discovered that at least 36 investors had invested over $3 million with Hoang. Hoang did not conduct a formal securities offering, and the investors received nothing resembling a prospectus or offering memoranda. The investors were targets of opportunity which Hoang picked off individually and frequently, since he lived off the proceeds.[2]

Hoang continued the investment fraud while he was on bond after the July 25, 2012, indictment. On November 8, 2012, the government filed a motion to revoke his bond based on his violation of the condition that he remain in his father's custody. The FBI had discovered that rather than living with his father, Hoang had rented an expensive house in the San Jose hills. The following day, Hoang was arrested and a search warrant was executed at his house and car. The agents found a subscription agreement and check for Hoang's sale of purported Utherverse stock dated November 8, 2013.

Hoang has been detained since his second arrest.

### III.  COMPUTATION OF THE GUIDELINE RANGE AND RESPONSE TO DEFENDANT'S OBJECTIONS TO THE COMPUTATION

"[T]he Guidelines are 'the starting point and the initial benchmark.'" *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (*en banc*). But, as the Ninth Circuit has explained:

> The district court may not presume that the Guidelines range is reasonable. Nor should the Guidelines factor be given more or less weight than any other. While the Guidelines are to be respectfully considered, they are one factor among the § 3553(a) factors that are to be taken into account in arriving at an appropriate sentence.

*Carty*, 520 F.3d at 991 (internal citations omitted). The court also observed that, "[w]e recognize that a Guidelines sentence 'will usually be reasonable,' and this done, we see no particular need for an

---

[1] The fact that Hoang did not actually own the stock he was purporting to sell does not affect his liability for securities fraud. *United States v. Deeb*, 175 F.3d 1163, 1169 (9th Cir.1999) ("It is no defense to a charge of fraudulent sale of securities that the defendant did not actually own the stock at the time of the false representations. This is the essence of many fraudulent sales transactions.")

[2] The PSR's very detailed account of the fraudulent schemes [PSR ¶ ¶ 6-51] has not been disputed by the defense as of the filing of this memorandum.

appellate presumption that says so." *Id*. at 994 (internal citation omitted).

Here, the government agrees with the computation in the PSR, which results in a range of 78 to 97 months. [PSR ¶ 109.]

The defendant objects to the loss figure used in the computation. At the time of the filing of this memorandum, neither the government nor the Probation Office had been informed of the exact nature of the objection.

The defendant also objects to the denial of the reduction for acceptance of responsibility under U.S.S.G. § 3E1.1. "The defendant bears the burden of showing that he has accepted responsibility for his actions." *United States v. Rojas-Pedroza*, 716 F.3d 1253, 1270 (9th Cir. 2013).

The government anticipates that the defendant will argue that he is entitled to the section 3E1.1 reduction because he has been compliant since the day he pleaded guilty, September 16, 2013. Actually, as far as we know, he has been compliant since he was arrested for bond violations on November 9, 2012 – he has been incarcerated since then. Application Note 1(B) to section 3E1.1 states that one of considerations for granting the reduction is the defendant's "voluntary termination or withdrawal from criminal conduct or associations." This did not happen here – the defendant stopped his crimes because the FBI locked him up and the magistrate judge revoked his bond.

Moreover, the courts that have considered the matter have rejected the proposition that sentencing courts are barred from weighing pre-guilty plea misconduct in assessing the section 3E1.1 reduction. An example is the First Circuit's decision in *United States v. McLaughlin*, 378 F.3d 35 (1st Cir. 2004). Among other bases for its holding, the court pointed to the illogical outcome if the defendant's narrow interpretation of section 3E1.1 was accepted:

> It would be perverse to encourage a practice whereby a defendant, released on bail, would be benefitted by waiting as long as possible before accepting responsibility. Yet that is what would happen if McLaughlin's argument were to prevail. Deferring a guilty plea would work to a defendant's advantage by shrinking the universe of conduct that could be counted against him in the acceptance-of-responsibility calculus. In other words, the longer the defendant postponed the entering of a guilty plea, the less the exogenous criminal conduct that the sentencing court would be able to consider. And this would be so regardless of the heinousness of the exogenous crimes or the lack of contrition that they might betoken. The guidelines ought to be construed in a commonsense manner, and we are not inclined to impute to the Sentencing Commission so counter-intuitive a design.

378 F.3d at 40. *See also United States v. Clements*, 142 Fed.Appx. 223, 2005 WL 1506280 (6th Cir.

GOVT SENTENCING MEMO
No. 12-CR-00583 EJD                    4

2005) (unpublished) (rejecting claim that since misconduct occurred prior to the entry of the defendant's guilty plea, it cannot be considered in determining whether he is entitled to the section 3E1.1 reduction (collecting cases)); *United States v. Warren*, 1993 WL 212513 (9th Cir. 1993) (unpublished) ("Warren's repeated criminal activity, which occurred between the time she was released on bond pending trial and the time she was placed in custody on state charges [before the guilty plea in the federal case], is inconsistent with 'voluntary termination or withdrawal from criminal conduct.' *See* § 3E1.1, comment. (n. 1(b)). Moreover, it is evidence that belies the sincerity of Warren's statements of remorse for the offense of conviction, particularly where, as here, the later conduct is almost identical to the conduct underlying the offense of conviction.")

In addition, the government submits that Hoang's own statement in which he purports to accept responsibility for his crimes demonstrates that in fact he has not yet grappled with the truth of the harm he has caused. The defendant's statement is set forth in paragraph 54 of the PSR. He claims that he tried to make money for his investors: "I really thought I could make things work legitimately … I could make money for myself and the other people and I tried. … I kept on trying to make things happen because I did not want to let people down."

Hoang sold stock that did not exist. This was not a scheme that had started with a legitimate intent and then the situation deteriorated. He did not even use the usual documentation for a securities offering such as a prospectus or offering memorandum. He relied on his ability to talk convincingly about the different stories he crafted for the companies the victims supposedly invested in and his own supposed employment with the DEA. As a prop, he had investors sign a subscription agreement that contained official-looking warnings concerning the Securities Act of 1933 and California state law.[3] And, although the agents searched two residences used by Hoang and storage locations and offices associated with him, and searched computers seized at these locations, the agents never found anything resembling formal accounting records – there were no records of the receipt of the investors' contributions or of what was done with their money.[4] Instead, the agents found numerous copies of

---

[3] Exhibit 3 (attached hereto) is a redacted copy of the subscription agreement for the last victim that was found in Hoang's car when he was arrested on November 9, 2012. It is representative of the form he used over the years.

[4] We also determined that Hoang did not file federal tax returns for the years 2005 through 2011. [See certification of nonfiling produced in discovery (bates no. JH001941).]

emails and other communications with investors designed to simulate a functioning business and to explain away delays in repayments to investors. Hoang's investment schemes were fraudulent from the beginning. Hoang's efforts to claim otherwise constitute a separate basis for denying the section 3E1.1 reduction. *See United States v. Scrivener*, 189 F.3d 944, 948 (9th Cir. 1999) ("[o]ne example of inconsistent conduct that weighs against a finding of acceptance of responsibility is a defendant's attempt to minimize his own involvement in the offense.").

## IV. EVALUATION OF THE SECTION 3553(a) FACTORS

### A. "[T]he nature and circumstances of the offense" (subsection 3553(a)(1))

The Sentencing Guidelines account for objective factors describing Hoang's crimes, such as the amount of loss [PSR ¶ 65] and the number of victims [PSR ¶ 66]. But the sentencing court can and should take into consideration the other impacts of fraud. *See United States v. Christensen*, 732 F.3d 1094, 1104 (9th Cir. 2013) (sentencing court properly considered the "life-destroying impacts" described by Christensen's victims, including "loss of homes, a failed marriage, postponement of retirement, foregone vacations, loss of life-savings, and loss of the ability to pay for children's private schooling.")

Hoang talked friends and acquaintances into giving him money and then used various fictions to avoid paying it back. Now, Hoang is judgment proof, and there is little likelihood that the investors will be made whole. There are consequences to this, and the following are examples. Investor Michael B. lost his house [PSR ¶ 34]. Investors Michael A. and Elaine F. both reported that they lost funds they hoped to use for their daughters' educations [victim impact statements]. Investor Mac P. lost money he hoped to donate to a charity, the American Liver Foundation, in memory of his deceased son [victim impact statement]. Investor Eli W. lost money he hoped to use to care for his grandmother in the last year of her life [victim impact statement]. Investor Denny C. lost half his savings, money he had been saving to get married and buy a home [victim impact statement].

The devastation Hoang caused should be reflected in a lengthy sentence.[5]

---

[5] As noted in *United States v. Rangel*, 697 F.3d 795 (9th Cir. 2012), this court can consider the likelihood that Hoang's victims will not be made whole – or anything close to that – in the context of assessing the harm he caused:

> The district court in this case did not consider Rangel's inability to pay restitution itself as an aggravating factor in imposing a longer sentence, but focused instead on the impact on the victims of Rangel's crimes. During the sentencing hearing, the district court noted that "one of the factors for the Court to consider under 3553 is restitution to the victims."

**B.     The "history and characteristics of the defendant" (subsection 3553(a)(1)) and the need to "provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner" (subsection 3553(a)(2)(D)) and "the kinds of sentences available" (subsections 3553(a)(3) and (4))**

As opposed to measuring the damage the defendant caused to society and his victims, these factors focus the court's attention inward, on the defendant himself.

Here, the defendant does not seem to have mental health issues [PSR at ¶ 99] or drug use problems [PSR at ¶ 100].[6]  He probably could benefit from any available vocational training since he has limited formal work experience [PSR ¶¶ 104].  He has a high school education [PSR at ¶ 101], and so he may benefit from programs offering additional educational opportunities.

He does not seem to have had an actual job since 2000.  His parents had little information concerning his employment history.  Indeed, his mother reported that he claimed he had a contract with the DEA [PSR at ¶ 104], and his father said that Hoang worked in law enforcement [PSR at ¶ 96].  And yet, without an actual job, he reported to Pretrial Services in July 2012 that he had a monthly income of $3,000 and received $5,000 per month from a "friend."  He also claimed to have vehicles worth $63,000, "valuable property" worth $35,000, and "business assets" worth $800,000.  [PSR at ¶ 105.]  All of this is a lie.  The agents found no assets that were worth seizing.

Instead, it appears that for much of his adult life Hoang relied on fraud to pay his living expenses, and that he tended to spend the money as it came in from investors.  Certainly, in recent years the frauds were a full-time pursuit.  Hoang's dependence on the schemes for his livelihood is illustrated by the attached statements for bank accounts in the name of CFVP LLC but controlled by Hoang (*see* attached Exhibit 1 (redacted copies of statements)).[7]  These are examples of disbursements for personal

---

> Continuing in this vein, the court repeatedly referred to the financial ruin that Rangel caused his victims, and the length of time it would take them to recover their losses. The court's discussion made clear that its concern over restitution was based on the impact Rangel's crime had on the victims and was not designed to punish Rangel for his inability to pay. At the end of the sentencing hearing, the court responded to Rangel's objection by reiterating that the sentence was based not on Rangel's inability to pay restitution but on "all of the harm and trauma that has befallen the [victims of the crimes]." Consideration of the impact on the victims was appropriate.

697 F.3d at 804.

[6] He indicated that he may have some form of alcohol problem [PSR at ¶ 100].

[7] This analysis (originally done by an IRS Criminal Investigation Special Agent) is summarized in paragraph 29 of the PSR.

GOVT SENTENCING MEMO
No. 12-CR-00583 EJD                                  7

use from the accounts that were funded by deposits of investments by Gary H.:

    a.    The bank statement for a CFVP LLC account at Chase Bank for December 2010, shows a beginning balance of about $500, and then two large deposits from Gary H., totaling $23,025, one for $19,000 on December 17, 2010, and one for $4,025 on December 24, 2010.  Once the first wire from Gary H. was received on December 17, 2010, $3,990 was immediately wired to Assured Management Group, apparently for rent;[8] and $409.39 was wired to Chase Auto for an "auto loan" (according to the bank statement).  The deposits from Gary H. are essentially the source of the funds in the account from December 17 2010, to the end of the month – the next deposit after Gary H.'s deposits was on December 31, 2010.  The bank statements do not reflect any disbursements during the month that have anything to do with investments.  Instead the charges to the account are to restaurants, gas stations, grocery stores, Home Depot, and the like and appear to be exclusively for personal expenses.  In addition to these transactions, Hoang withdrew approximately $7,800 in cash from the account.  As of December 30, 2010, the account balance was only $1,088.15, indicating that Hoang had spent most of the investment from Gary H. ($23,025) on personal expenses .

    b.    The bank statement for a CFVP LLC account at Wachovia Bank for February 2010, shows a beginning balance of about $128, and one deposit of $50,000 from Gary H. on February 4, 2010 (which once again constitutes the majority of funds deposited that month).  Almost all of funds from Gary H. were spent during the month.  Most of these funds were either withdrawn from the account for unknown purposes or spend on apparently personal purposes.  There was no activity that was identifiable as being related to one of the investments Gary H. thought he was making.  Approximately $35,000 was withdrawn through the month for unknown purposes:  the bank statement identifies these transactions as "counter withdrawals."  The remaining $15,000 was spent for apparent personal uses, including multiple purchases at Stevens Creek Surplus (Military and Law Enforcement outlet), Wilshire Consumer (most likely an auto loan), many restaurant purchases, a $1,638 purchase at a Diamonds by Chainary store (jewelry store), a $676 purchase at Zales Outlet (jewelry store), airlines tickets, gas stations, rental car companies, and multiple purchases at Gamestop.

---

[8] In his December 1, 2011, rental application for the house at 4861 Stoneyford Ct, San Jose (where he was arrested in July 2012), Hoang listed Assured Management as the owner/agent of his prior residence.

GOVT SENTENCING MEMO
No. 12-CR-00583 EJD        8

A lengthy sentence is indicated where, as here, the defendant has been a full-time criminal for much of his adult life and used fraud – instead of an actual job – to support his lifestyle. *See United States v. Erpenbeck*, 532 F.3d 423, 437 (6th Cir. 2008) (lengthy sentence upheld where sentencing court considered, among other factors, "the length of time defendant continued to engage in his scheme while at the same time indulging in luxuries and an extravagant lifestyle ….")

    **C.**    **The need "to afford adequate deterrence to criminal conduct" (subsection 3553(a)(2)(B)), to "protect the public from other crimes of the defendant" (subsection 3553(a)(2)(C)) and "to reflect the seriousness of the offense and to promote respect for the law, and to provide just punishment for the offense" (subsection 3553(a)(2)(A))**

In addressing the concerns of justice and deterrence, it is important to examine what if anything has deterred Hoang in the past. The answer is nothing – despite warnings, an arrest and the obvious dangers of detection, he has proceeded with his frauds.

For example, there are multiple examples of Hoang using purported documents from a major accounting firm and two major law firms as props in efforts to assure investors of the legitimacy of the transactions or to deflect investors' inquiries about repayments. [*See, e.g.*, PSR at ¶¶ 23 (use of purported documents from Deloitte & Touche LLP, the DLA Piper law firm, and the law firm of Wilson Sonsini Goodrich & Rosati), 25 (use of purported documents from Deloitte & Touche LLP), 27 (use of documents purportedly from DLA Piper), 32 (use of purported documents from Deloitte & Touche LLP), 33 (use of purported email from Wilson Sonsini), 36 (use of documents purportedly from DLA Piper), 40 (use of purported documents from Deloitte & Touche LLP), 46 (use of documents purportedly from DLA Piper).] Hoang even used a purported letter from the IRS to support his claim to an investor that the IRS was responsible for the delay in repaying an investor. [PSR at ¶ 37.] And there were many communications in which Hoang used his supposed employment with the DEA as an excuse for delays in responding to investors. [*E.g.,* PSR at ¶ 37 (text messages).]

The use of the law firms, the accounting firm and the government agencies as props in the frauds revealed at least reckless disregard of the obvious risk of detection. One investor simply contacted DLA Piper and learned that the attorney named in the document provided by Hoang did not exist. [PSR at ¶ 46.] Similarly a different investor forwarded to DLA Piper the email that Hoang had supplied, and the law firm confirmed that it had no involvement with Hoang and demanded that Hoang cease making

false claims about the law firm's involvement.  That demand was in an email to Hoang dated January 6, 2012.  Yet a month later, in communicating with a different investor, Hoang supplied another email supposedly from a DLA Piper attorney which supposedly documented the existence of a planned dividend distribution.  That email was dated February 7, 2012.  Redacted copies of the documents involved in these communications are attached as Exhibit 2.

Undeterred by the warning from the law firm, Hoang was similarly undeterred when he was arrested by the DEA in July 2012.  He was required as a condition of his bond to reside with his father who was designated his custodian. Instead, he rented a large house and lived there.  He told one of his investors, Mimi N., that he needed money for an attorney for a legal situation,  In an October 12, 2012, text message, Hoang provided a name for the attorney that was really the name of the person who received the rent checks for Hoang's new house ("my attorney's name is [redacted]").  The investor supplied a $3,000 check to Hoang, made payable to this person, which basically paid a month's rent.

Up to the day before his second arrest, Hoang was selling non-existent stock.  [PSR at ¶ 41.] The FBI found Peter S.'s check to purchase 2,500 shares of Utherverse Digital stock in Hoang's car when he was arrested.

What emerges from the story of Hoang's dealings with his investors and associates is a pattern of sustained and relentless predation.  This history demonstrates that a light or modest sentence will be insufficient.  Hoang's crimes require a stiff sentence to deter him from future crimes, to deter others from taking Hoang's path, to ensure justice, and finally and quite simply to protect society from Hoang.

## V. CONCLUSION

For the reasons stated above, the government recommends the following: a prison sentence of 84 months, a term of supervised release of three years, a special assessment of $400 and restitution as recommended by the Probation Officer.

DATED: June 25, 2014.                                    Respectfully submitted,

                                    MELINDA HAAG
                                    United States Attorney

                                  _____/S_____
                                  Thomas A. Colthurst
                                  Assistant United States Attorney